TH:MWG/SMS/KRA/MND/BGD
F. #2024R00654

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Docket No. 25-CR-314 (RER)

ERNEST AIELLO, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO SEVER, DISMISS AND SUPPRESS

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Michael W. Gibaldi
Sean M. Sherman
Kamil Ammari
Sophia Suarez
Molly N. Delaney
Brandon G. Davis
Assistant U.S. Attorneys
(Of Counsel)

TABLE OF CONTENTS


PRELIMINARY STATEMENT .................... 1

FACTUAL BACKGROUND .................... 1

I. Relevant Offense Conduct .................... 1

A. Overview of the Rigged Poker Scheme .................... 2

B. The Involvement of Organized Crime .................... 3

C. Acts of Violence in Furtherance of the Conspiracy .................... 4

II. Relevant Procedural History .................... 6

ARGUMENT .................... 7

I. The Motion for Severance Should Be Denied .................... 7

A. Joinder Was Proper Pursuant to Rule of Criminal Procedure 8(b) .................... 7

B. The Defendants Are Not Entitled to Severance Under Rule 14(a) .................... 11

II. The Defendants' Motion to Dismiss Should Be Denied .................... 16

A. Applicable Law .................... 16

B. Discussion .................... 18

III. Fama's Motion to Suppress Should Be Denied .................... 20

A. Applicable Law .................... 21

B. Discussion .................... 24

CONCLUSION .................... 28

# TABLE OF AUTHORITIES

Page(s)

Cases

*Boyce Motor Lines, Inc. v. United States*,
342 U.S. 337 (1952)............................................................ 16

*Braverman v. United States*,
317 U.S. 49 (1942)............................................................ 17

*Bruton v. United States*,
391 U.S. 123 (1968)............................................................ 12

*City of Escondido, Cal. v. Emmons*,
586 U.S. 38 (2019)............................................................ 23

*Costello v. United States*,
350 U.S. 359 (1956)............................................................ 16

*Davis v. United States*,
564 U.S. 229 (2011)............................................................ 22

*District of Columbia v. Wesby*,
583 U.S. 48 (2018)............................................................ 23

*Groh v. Ramirez*,
540 U.S. 551 (2004)............................................................ 23

*Illinois v. Gates*,
462 U.S. 213 (1983)............................................................ 21, 22

*Kaley v. United States*,
571 U.S. 320 (2014)............................................................ 16

*Massachusetts v. Upton*,
466 U.S. 727 (1984)............................................................ 22

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*,
577 F.3d 415 (2d Cir. 2009) ............................................................ 23

*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991) ............................................................ 22

*Texas v. Brown*,
460 U.S. 730 (1983)............................................................ 21

*United States v. Aiyer*,
33 F.4th 97 (2d Cir. 2022) .......... 16

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998) .......... 17

*United States v. Amato*,
15 F.3d 230 (2d. Cir. 1994) .......... 11

*United States v. Aracri*,
968 F.2d 1512 (2d Cir. 1992) .......... 19

*United States v. Attanasio*,
870 F.2d 809 (2d Cir. 1989) .......... 8, 9

*United States v. Barret*,
824 F. Supp. 2d 419 (E.D.N.Y. 2011) .......... 18

*United States v. Berger*,
224 F.3d 107 (2d Cir. 2000) .......... 18, 20

*United States v. Bertolotti*,
529 F.2d 149 (2d Cir. 1975) .......... 20

*United States v. Cardascia*,
951 F.2d 474 (2d Cir. 1992) .......... 12

*United States v. Casamento*,
887 F.2d 1141 (2d Cir. 1989) .......... 12

*United States v. Cervone*,
907 F.2d 332 (2d Cir. 1990) .......... 8

*United States v. Cheese*,
No. 18-CR-33 (NGG), 2020 WL 705217 (E.D.N.Y. Feb. 12, 2020) .......... 8

*United States v. Daskal*,
676 F. Supp. 3d 153 (E.D.N.Y. 2023) .......... 23

*United States v. De La Pava*,
268 F.3d 157 (2d Cir. 2001) .......... 16

*United States v. Delgado*,
972 F.3d 63 (2d Cir. 2020) .......... 14

*United States v. DiScala*,
No. 14-CR-399 (ENV), 2018 WL 1187394 (E.D.N.Y. Mar. 6, 2018) .......... 11

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) .......... 27

*United States v. Fazio*,
770 F.3d 160 (2d Cir. 2014) .......... 13

*United States v. Feola*,
651 F. Supp. 1068 (S.D.N.Y. 1987) .......... 9, 10, 15

*United States v. Feyrer*,
333 F.3d 110 (2d Cir. 2003) .......... 9, 10

*United States v. Friedman*,
854 F.2d 535 (2d. Cir. 1988) .......... 11, 12

*United States v. Gabriel*,
920 F. Supp. 498 (S.D.N.Y. 1996) .......... 17, 18, 19

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) .......... 21

*United States v. Geibel*,
369 F.3d 682 (2d Cir. 2004) .......... 20

*United States v. Goldberg*,
756 F.2d 949 (2d Cir. 1985) .......... 16

*United States v. Greenberg*,
No. 21-CR-92, 2022 WL 827304 (S.D.N.Y. Mar. 9, 2022) .......... 18

*United States v. Haim*,
218 F. Supp. 922 (S.D.N.Y. 1963) .......... 15

*United States v. Henry*,
861 F. Supp. 1190 (S.D.N.Y. 1994) .......... 13

*United States v. Jakobetz,*
955 F.2d 786 (2d Cir. 1992) .......... 27

*United States v. Jimenez*,
824 F. Supp. 351 (S.D.N.Y. 1993) .......... 12

*United States v. Johansen*,
56 F.3d 347 (2d Cir. 1995) .......... 18, 19

*United States v. Jones*,
482 F.3d 60 (2d Cir. 2006) .......... 20

*United States v. Leon*,
468 U.S. 897 (1984) ... 22, 23, 27

*United States v. Lyles*,
593 F.2d 182 (2d Cir. 1979) ... 12

*United States v. Martino*,
664 F.2d 860 (2d Cir. 1981) ... 26

*United States v. Molina*,
No. 11-CR-528, 2013 WL 2455922 (S.D.N.Y. June 5, 2013) ... 17, 18

*United States v. Murray*,
618 F.2d 892 (2d Cir. 1980) ... 17, 18

*United States v. Muyet*,
945 F. Supp. 586 (S.D.N.Y. 1996) ... 14, 15

*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020) ... 23

*United States v. Nerlinger*,
862 F.2d 967 (2d Cir. 1988) ... 9

*United States v. Ohle*,
678 F. Supp. 2d 215 (S.D.N.Y. 2010) ... 17, 18

*United States v. Ortiz*,
143 F.3d 728 (2d Cir. 1998) ... 26

*United States v. Page*,
657 F.3d 126 (2d Cir. 2011) ... 13

*United States v. Persing*,
No. 06-CR-815 (BMC), 2008 WL 11344620 (E.D.N.Y. May 6, 2008) ... 9, 15

*United States v. Pope*,
613 F.3d 1255 (10th Cir. 2010) ... 16

*United States v. Potamitis*,
739 F.2d 784 (2d Cir. 1984) ... 18

*United States v. Price*,
No. 05-CR-492 (NGG), 2010 WL 1949361 (E.D.N.Y. May 11, 2010) ... 17

*United States v. Rajarantnam*,
No. 13-CR-211, 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014) ... 17

*United States v. Raniere*,
384 F. Supp. 3d 282 (E.D.N.Y. 2019) ........ 17

*United States v. Raymonda*,
780 F.3d 105 (2d Cir. 2015) ........ 22, 26, 27

*United States v. Reale*,
No. 96-CR-1069 (DAB), 1997 WL 580778 (S.D.N.Y. Sept. 17, 1997) ........ 17

*United States v. Rittweger*,
524 F.3d 171 (2d Cir. 2008) ........ 8, 9, 10, 13

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993) ........ 13, 15

*United States v. Rucker*,
32 F. Supp. 2d 545 (E.D.N.Y. 1999) ........ 12

*United States v. Russo*,
No. 20-CR-023 (DLI), 2021 WL 1723250 (E.D.N.Y. Apr. 30, 2021) ........ 19

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) ........ 22

*United States v. Silva*,
146 F.4th 183 (2d Cir. 2025) ........ 25

*United States v. Singh*,
390 F.3d 168 (2d Cir. 2004) ........ 22, 24, 26

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003) ........ 13

*United States v. Sturdivant*,
244 F.3d 71 (2d Cir. 2001) ........ 17, 18

*United States v. Szur*,
1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) ........ 19

*United States v. Turoff*,
853 F.2d 1037 (2d Cir. 1988) ........ 9, 10

*United States v. Tuzman*,
301 F. Supp. 3d 430 (S.D.N.Y. 2017) ........ 9, 10

*United States v. Uccio*,
917 F.2d 80 (2d Cir. 1990) ........ 8

*United States v. Ventura*,
724 F.2d 305 (2d Cir. 1983) .......... 12

*United States v. Walsh*,
194 F.3d 37 (2d Cir. 1999) .......... 16

*United States v. Watson*,
No. 23-CR-82 (EK), 2023 WL 7300618 (E.D.N.Y. Nov. 6, 2023).......... 26

*United States v. Yannotti*,
541 F.3d 112 (2d Cir. 2008) .......... 17

*Walczyk v. Rio*,
496 F.3d 139 (2d Cir. 2007) .......... 22, 24, 25

*Zafiro v. United States*,
506 U.S. 534 (1993).......... 12

Statutes

18 U.S.C. § 1349.......... 7

18 U.S.C. § 1951(a) .......... 7

18 U.S.C. § 1955(a) .......... 7

18 U.S.C. § 1956(h) .......... 7

Rules

Fed. R. Crim. P. 8(a).......... 8, 17

Fed. R. Crim P. 8(b).......... 8, 11

Fed. R. Crim. P. 12(b)(1) .......... 16

Fed. R. Crim. P. 14(a).......... 11

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant Lee Fama's motions for severance of defendants, dismissal of Count One, and suppression of evidence seized pursuant to a judicially authorized search warrant of his home. *See* ECF No. 566 ("Fama Mot.").[1]

First, joinder is appropriate in this case because each of the moving defendants and their co-defendants committed crimes related to, and in furtherance of, a nationwide conspiracy to operate underground poker games using rigged cheating technology. The law strongly favors joint trials of defendants who are indicted together to avoid inefficiency and waste of resources, and the moving defendants have not identified any realistic prospect that their trial rights would be prejudiced by a joint trial.

Second, the law is clear that defendants are not entitled to dismissal of Count One as duplicitous, because Count One alleges the existence of a single conspiracy.

Third, the warrant to search Fama's premises was supported by ample probable cause to believe that evidence of the charged crimes would be located in the places to be searched. And even if the warrant was deficient in some way, it is clear that agents acted in good faith.

## FACTUAL BACKGROUND

### I. Relevant Offense Conduct

This case involves a complex scheme to rig illegal poker games using wireless cheating technology in the Eastern District of New York and other locations across the United

---

[1] Defendants Ernest Aiello and Matthew Daddino have since filed letters joining Fama's motions to the extent applicable to them. *See* ECF Nos. 586, 590.

States (the "Rigged Poker Scheme"). Participants in the scheme included game organizers, who arranged for unwitting victims to play in the underground poker games; suppliers of the rigged technology; former professional athletes, who were enlisted in the scheme to entice the victims' participation in the games; money launderers; and members and associates of the Bonanno, Gambino, and Genovese organized crime families of La Cosa Nostra ("LCN"), who backed games in the New York area and took a percentage of the criminal proceeds from those games.

LCN members and associates—including defendants Aiello, Daddino, and Fama—had a foothold in the rigged poker scheme because they had preexisting control over "straight" (*i.e.*, non-rigged) poker games in and around New York City, where some of the rigged poker games also occurred. One was hosted principally at 147 Lexington Avenue in Manhattan and was on record with the Bonanno organized crime family (the "Lexington Avenue Game"). Another was hosted principally at 80 Washington Place in Manhattan and was on record with the Gambino family (the "Washington Place Game").

As part of the scheme, co-conspirators also committed acts of violence, including the robbery and extortions charged in the Indictment.

A. <u>Overview of the Rigged Poker Scheme</u>

Beginning as early as 2019, members of the charged conspiracy initiated a scheme to use wireless cheating technology to run rigged poker games (most commonly, Texas Hold'em) across the United States, including in the Hamptons, Manhattan, Las Vegas, and Miami. In a typical unmanipulated, or "straight," poker game, the dealer used an automatic shuffling machine to shuffle the cards randomly before dealing them to all the players in a particular order. In the rigged games, by contrast, the defendants and their co-conspirators used shuffling machines that had been secretly altered to use concealed technology to read the cards in

the deck, predict which player at the table had the best poker hand, and relay that information via interstate wires to an off-site operator. The off-site operator then relayed the information via cellphone back to a member of the conspiracy who was playing at the table, referred to as the "Quarterback" or "Driver." The Quarterback then secretly signaled this information (usually by prearranged signals like touching certain chips or other items on the table) to other co-conspirators playing at the table, who were also participants in the scheme. Collectively, the Quarterback and other players in on the scheme (*i.e.*, the cheating team) then used this information to win poker games against unwitting victims, who sometimes lost tens or hundreds of thousands of dollars at a time.

B. The Involvement of Organized Crime

The game organizers often made use of preexisting illegal gambling operations and the personnel of those operations to run the rigged games. When defendants Saul Becher, Zhen Hu, and Seth Trustman joined the rigged poker conspiracy, they had already been operating the Lexington Avenue Game with the backing of the Bonanno organized crime family. Thus, Becher, Zhen Hu, and Trustman used many of the same locations and personnel to operate their rigged games, and they were required to make payments to the Bonanno organized crime family for the games (rigged or straight) that they operated. In particular, defendant Julius Ziliani, who is an inducted member of the Bonanno organized crime family, and defendant Thomas Gelardo, an associate of the Bonanno organized crime family at the time, supervised the Lexington Avenue Game and took a portion of its criminal proceeds. Defendant Ernest Aiello, a high-

ranking member of the Bonanno organized crime family, did not typically visit the gambling location itself but received proceeds from the rigged and non-rigged games.

Similarly, when defendants Ammar Awawdeh and John Gallo joined the rigged poker scheme, they had already been operating the Washington Place Game with the backing of the Gambino organized crime family, including defendants Lee Fama, Joseph Lanni, and Angelo Ruggiero, Jr. Defendant Matthew Daddino, a member of the Genovese organized crime family, also participated in the management of the 80 Washington Place Game. Thus, defendants Awawdeh and Gallo used many of the same locations and personnel to operate the rigged games, and they were required to make payments to the Gambino family for the games (rigged or straight) that they operated.

In 2023, the Lexington Avenue Game and the Washington Place Game merged, and they operated jointly to conduct rigged games using the same technology supplied by co-conspirators. As a result of the merger, the Bonanno and Gambino organized crime families agreed that they would each take a percentage of the proceeds of the poker games—both rigged and non-rigged. For example, in a text message from Zhen Hu to Trustman on September 21, 2023, Zhen Hu reported that he had spoken with Gallo (a Gambino associate) about sending proceeds of the rigged games in June and July 2023 that defrauded John Doe #1 of approximately $1.8 million, which is described in the Indictment, and that Ziliani (a Bonanno member) had said to send the money to Fama (a Gambino member).

C. Acts of Violence in Furtherance of the Conspiracy

1. Extortion of John Doe #5 (Count Five)

As charged in Count Five of the Indictment, in or about November 2022, Zhen Hu assaulted John Doe #5, a poker player, for not paying him a gambling debt. Later, Zhen Hu,

Ziliani, Gelardo, and other individuals went to 80 Washington Place and demanded to see John Doe #5. John Doe #5 eventually came outside, and Gelardo assaulted John Doe #5 again.

2. Robbery of John Doe #7 (Count Six)

As charged in Count Six of the Indictment, defendants Awawdeh, Hoti, Mazzola, Minucci, and Stroud plotted to rob a rigged shuffling machine from John Doe #7 in September 2023. The robbery was successful.

In the early morning hours of September 7, 2023, John Doe #7 was in a car with Hoti and Mazzola when two individuals recruited by Minucci approached the car, brandished a gun, and demanded the "box" from John Doe #7. At the time of the robbery, Hoti, who was driving the car and in on the scheme along with Mazzola, kept the car in park and did not drive away. John Doe #7 turned over the rigged shuffling machine to Minucci and the gunmen.

The day after the robbery, Stroud texted Minucci to arrange a meeting. Several hours later, Stroud texted Daddino: "That guy just dropped that thing off."

3. Extortion of John Doe #6 (Count Seven)

As charged in Count Seven of the Indictment, on or about September and October 2023, defendants Becher, Zhen Hu, and Trustman extorted John Doe #6 based on John Doe #6's prolonged inability to repay a $10,000 poker debt. Becher, Zhen Hu, and Trustman discussed

over text messages how they expected John Doe #6 to make a payment after Trustman had threatened them by invoking his connections to organized crime.

The threats worked. On October 18, 2023, John Doe #6 dropped off a $5,000 check at 147 Lexington Avenue. The payee on the check was left blank, and the memo line stated: "Poker."

4. Violence at 80 Washington Place on October 11, 2023

As noted above, the Lexington Avenue Game and Washington Place Game merged in 2023, with the Bonanno and Gambino organized crime families both receiving a cut of the proceeds from rigged poker games. However, in the fall 2023, defendant Awawdeh restarted his own competing poker game at 80 Washington Place on the same night as the Lexington Avenue Game. In response, on the night of October 11, 2023, Gelardo, Ziliani, and others—with Aiello's explicit approval—stormed 80 Washington Place with weapons. Ziliani was armed with a gun, and Gelardo was armed with a baton. They entered 80 Washington Place while a poker game was ongoing and assaulted Awawdeh. A brawl broke out, and Gelardo and Ziliani left the location.

## II. Relevant Procedural History

On October 23, 2025, a seven-count indictment was unsealed in the Eastern District of New York charging 31 defendants—including moving defendants Aiello, Daddino, and Fama—with various crimes in connection with their participation in the Rigged Poker Scheme.

To date, seven defendants have not pleaded guilty or scheduled a change of plea hearing: Ernest Aiello, Chauncey Billups, Matthew Daddino, Eric Earnest, Lee Fama, Thomas

Gelardo, and Curtis Meeks. For the Court's convenience, below is a summary of the remaining defendants and the charges against them.

| Defendant | Charges |
|---|---|
| Ernest Aiello | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three) |
| Chauncey Billups | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) |
| Matthew Daddino | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) |
| Eric Earnest | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) |
| Lee Fama | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two) |
| Thomas Gelardo | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act extortion conspiracy – John Doe #5, in violation of 18 U.S.C. § 1951(a) (Count Five) |
| Curtis Meeks | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) |

## ARGUMENT

### I. The Motion for Severance Should Be Denied

#### A. Joinder Was Proper Pursuant to Rule of Criminal Procedure 8(b)

##### 1. Applicable Law

A motion to sever should be denied unless either (1) counts or defendants have been improperly joined together in an indictment or (2) a defendant would suffer substantial

prejudice from a joint trial. Federal Rule of Criminal Procedure 8(a) governs the joinder of multiple counts in one indictment and Rule 8(b) governs the joinder of multiple defendants. Where, as here, there are both multiple defendants and multiple counts, joinder is proper if the defendants are properly joined together under Rule 8(b). *United States v. Attanasio*, 870 F.2d 809, 814 (2d Cir. 1989) ("[When] the joinder involves both multiple offenses and multiple defendants, Rule 8(b) must be applied.").

Under Rule 8(b), an indictment may jointly charge multiple defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim P. 8(b). Defendants engage in the same "series of acts or transactions constituting an offense" when their "criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'" *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (quoting *Attanasio*, 870 F.2d at 815); *see also United States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008). This rule "does not require a common goal or conspiracy, but rather 'requires only that the counts be connected by common facts or participants.'" *United States v. Cheese*, No. 18-CR-33 (NGG), 2020 WL 705217, at *4 (E.D.N.Y. Feb. 12, 2020) (citation omitted).

Whether joinder is warranted "must be determined on a case-by-case basis." *Rittweger*, 524 F.3d at 177 (2d Cir. 2008). In evaluating whether joinder is proper under this rule, the Second Circuit has instructed courts to take a "commonsense" approach which considers "whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper." *Id.*

"It is an 'established rule' that a 'non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).'" *United States v. Uccio*, 917 F.2d 80,

87 (2d Cir. 1990) (quoting *United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988)). Joinder is also proper when an indictment charges multiple overlapping conspiracies. *See United States v. Persing*, No. 06-CR-815 (BMC), 2008 WL 11344620, at *1 (E.D.N.Y. May 6, 2008). "[E]ven where distinct offenses are committed by differing groupings of defendants, Rule 8(b) permits joinder as long as there is overlap between the overall scheme and the individual acts in accord with that scheme." *Id.*; *see also Rittweger*, 524 F.3d 178 ("Provided that the defendants are 'alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses,' members of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy."); *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (finding that joinder of two defendants charged in "parallel scheme[s]" was proper when "two conspiracies shared a common plan"); *Attanasio*, 870 F.2d at 815 (defendants in two conspiracies were properly joined because the "transactions in both conspiracy counts were part of a series of acts that shared a common purpose"); *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988) (when there is "a key link between the two offenses—one scheme stemmed from the other . . . that link provides a sound basis for joinder under Rule 8(b)"); *United States v. Tuzman*, 301 F. Supp. 3d 430, 439 (S.D.N.Y. 2017) ("where two charged conspiracies are 'intertwined' with each other, they are sufficiently related to justify joinder").

With respect to the joinder of multiple conspiracies, the Second Circuit "takes a broad view of the 'common scheme' requirement." *United States v. Feola*, 651 F. Supp. 1068, 1123 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ("there is no reason why people cannot enter into two separate criminal agreements more or less at the same time . . . If they do, they come within the joinder rule, subject to severance in the interests of justice").

2. Discussion

Joinder of the defendants and charges was appropriate in this case. "Under the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment.'" *Rittweger*, 524 F.3d at 178 (quoting Fed. R. Crim. P. 8(b)).

The defendants argue that there is a "clear disconnect between the charges against Mr. Fama and the Hobbs Act Conspiracies in the Indictment" (Fama Mot. 13), but the Indictment plainly shows there are overlapping facts, participants, and a common plan which warrants joinder. As alleged, the Rigged Poker Scheme and the Hobbs Act offenses are indisputably "intertwined," *Tuzman*, 301 F. Supp. 3d at 439, and "united by overlapping facts and participants and a common plan." *Feyrer*, 333 F.3d at 114. Count Six charges a conspiracy to rob a *rigged shuffling machine* in furtherance of the overarching Rigged Poker Scheme. Indictment ¶¶ 57-58. And Counts Five and Seven charge conspiracies to extort two victims to collect debts owed from the illegal poker games. *Id.* ¶¶ 55-56, 59-60.

Notably, all defendants charged in the Hobbs Act offenses are also charged with participating in the overarching Rigged Poker Scheme. *See Feola*, 651 F. Supp. 1068 at 1123 (denying motion to sever two distinct conspiracies and noting "the presence of common defendants in the two conspiracies connects them sufficiently to permit joinder under Rule 8, and if severance is to be granted it must be under Rule 14."). The timing of the Hobbs Act offenses overlaps with the timeframe of the Rigged Poker Scheme. And the Rigged Poker Scheme and the Hobbs Act offenses "shared a common plan," namely, to defraud victims through manipulated poker games. *Feyrer*, 333 F.3d at 114. Indeed, proof of the Hobbs Act offenses, which involves details on how the co-conspirators obtained cheating technology and collected victims' money, is "indispensable for a full understanding" of the Rigged Poker Scheme. *Turoff*,

853 F.2d at 1044 (2d Cir. 1988) (because "the tax fraud hinged on the fraudulent activities taken to advance the Compumeter conspiracy . . . the proof of one scheme is indispensable for a full understanding of the other" and "that link provides a sound basis for joinder under Rule 8(b)").

Finally, the defendants argue that joinder was improper because the Hobbs Act offenses are "charged in separate counts with separate participants," and "[n]othing in the Indictment alleges Mr. Fama's knowledge of the Hobbs Act Conspiracies." Fama Mot. 15. These arguments are also meritless. Rule 8(b) plainly states that "[a]ll defendants need not be charged in each count" for joinder to be proper. Fed. R. Crim. P. 8(b). And "[i]t is also the case that—where there are two conspiracies—knowledge of the other conspiracy is not necessarily required for joinder." *United States v. DiScala*, No. 14-CR-399 (ENV), 2018 WL 1187394, at *20 (E.D.N.Y. Mar. 6, 2018) (denying motion to sever because "while Morris is not alleged to have had knowledge of the other Omniview-related schemes, the indictment does allege an overarching conspiracy as well as an overlap of plan and some of the participants in the other schemes.").

Accordingly, joinder was proper pursuant to Rule 8(b).

B. <u>The Defendants Are Not Entitled to Severance Under Rule 14(a)</u>

1. <u>Applicable Law</u>

Under Federal Rule of Criminal Procedure 14(a), a defendant who has been properly joined under Rule 8(b) may still move for severance, but he "carries [the] heavy burden" of showing that a joint trial "will result in substantial prejudice." *United States v. Amato*, 15 F.3d 230, 237 (2d. Cir. 1994); *see also United States v. Friedman*, 854 F.2d 535, 563 (2d. Cir. 1988) ("A defendant raising a claim of prejudicial spillover bears an extremely heavy burden.").

"[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The decision whether to grant a motion for severance is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a showing that a defendant was substantially prejudiced by a joint trial. *See United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989); *see also Friedman*, 854 F.2d at 563 (a defendant must show that "he or she suffered prejudice so substantial as to amount to a miscarriage of justice" to warrant reversal of a district court's decision on a motion to sever).

In assessing whether to grant a motion for severance, it is well established that "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money and scarce judicial resources that joint trial permits." *United States v. Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). The Supreme Court has consistently reaffirmed "a preference in the federal system for joint trials of defendants who are indicted together" because such trials promote efficiency, fairness, and prevent the injustice of inconsistent verdicts. *Zafiro*, 506 U.S. at 537; *see also United States v. Cardascia*, 951 F.2d 474, 482-83 (2d Cir. 1992); *United States v. Ventura*, 724 F.2d 305, 312 (2d Cir. 1983) (where "defendants . . . are jointly indicted [they] should be jointly tried"). Furthermore, joint trials "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury." *United States v. Rucker*, 32 F. Supp. 2d 545, 547 (E.D.N.Y. 1999); *see also Bruton v. United States*, 391 U.S. 123, 134 (1968) (joint trials conserve state funds, diminish inconvenience to witnesses and avoid delays); *United States v. Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (joint trials conserve resources, lessen the burden on

jurors and avoid repetitive testimony). Given the "the powerful institutional interests in judicial economy favoring joint rather than separate trials," *United States v. Henry*, 861 F. Supp. 1190, 1199 (S.D.N.Y. 1994), "the principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

The preference for a joint trial is particularly strong when defendants are charged together in the same conspiracy. *United States v. Fazio*, 770 F.3d 160, 166 (2d Cir. 2014) ("The clear preference for joint trials, however, is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme."). This strong preference is not overcome simply because some defendants are less involved in the conspiracy than others. Because it is impossible for all defendants included in a conspiracy to have the same role, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

Differing proof against each defendant is also not a bar to a joint trial. As an initial matter, evidence is often admissible against all defendants when they are charged as part of the same conspiracy. *See, e.g.*, *Spinelli*, 352 F.3d 48, 55-56 (finding that a joint trial was not prejudicial when "much of" the evidence introduced at trial "was relevant to proving the nature and scope of the conspiracy in which both [defendants] were, to differing degrees, involved").

Even when evidence is admissible against certain defendants and not others, a joint trial may still be appropriate. *Rittweger*, 524 F.3d at 179 ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.") Any prejudice caused by the introduction of evidence against some defendants and not others can typically be cured with the appropriate jury instruction. *United States v. Page*, 657 F.3d 126,

129 (2d Cir. 2011) ("[L]ess drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice and permit joinder.") (internal quotations and brackets omitted). For example, the Second Circuit has found that a district court "sufficiently addressed the risk of spillover prejudice" when the district court instructed the jury "that it must consider the guilt of each [d]efendant separately," and "that a person may know or be friendly with a criminal without being a criminal himself." *Delgado*, 972 F.3d at 81.

2. Discussion

The defendants argue that severance is necessary due to the risk of "spillover prejudice." Fama Mot. 16. Specifically, the defendants allege that that, in connection with the Hobbs Act offenses, the jury may hear "inflammatory" evidence regarding "threats of violence to extort" a victim and "a gunpoint robbery to steal a rigged shuffling machine," and there is a risk jurors will "attribute violence" to the trial defendants. *Id.*[2]

This argument fails. As courts have noted, "[c]laims of prejudicial spillover rarely succeed, particularly where the defendant advancing the claim is charged along with other defendants in a . . . conspiracy." *United States v. Muyet*, 945 F. Supp. 586, 596 (S.D.N.Y. 1996). Here, Aiello, Daddino, and Fama are charged with wire fraud conspiracy for their participation in the Rigged Poker Scheme, which alleges that the co-conspirators obtained and used rigged shuffling machines to defraud their victims, as well as used threats and intimidation to assure payment of debts from the Rigged Games and the 'square' illegal poker games." Indictment ¶¶ 37-38. Accordingly, evidence of the defendants' co-conspirators obtaining cheating technology and collecting payments derived from the poker games is admissible against the defendants as

[2] At this point, the only remaining defendant charged with a Hobbs Act offense is Thomas Gelardo, who is charged with one count of Hobbs Act extortion conspiracy.

proof of the existence and nature of the Rigged Poker Scheme. *See Muyet*, 945 F. Supp. at 596 (denying motion to sever where "crux of defendant's argument is that in a joint trial, he will be prejudiced by evidence of his codefendants' acts of violence" because "even if the Court were to grant severance, much of the evidence regarding his codefendants' acts of violence would be admissible in his trial as proof of the existence and nature of the narcotics conspiracy."). As the Second Circuit has recognized, "[e]vidence at the joint trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) (affirming denial of a motion to sever defendants who "personally were not charged with acts of violence" because they were members of the conspiracy and "evidence of the workings of the conspiracy" would have been admissible in their individual trials"); *Persing*, 2008 WL 11344620, at *2 (denying motion to sever because "the spillover effect of evidence of the violent acts alleged against his co-defendants" does not amount to substantial prejudice).

The defendants' motion "merely offer[s] the conclusory assertion that there will be an incurable spillover effect" from the inclusion of evidence of the Hobbs Act offenses, which is insufficient to meet the "heavy" burden of showing "substantial prejudice. *Feola*, 651 F. Supp. at 1122 (denying motion to sever where defendants "alleged that joinder of [co-defendant's] weapons counts prejudices them by raising an association in the minds of the jurors between them and a man shown by those charges to be a disreputable or violent character."); *United States v. Haim*, 218 F. Supp. 922, 932 (S.D.N.Y. 1963) ("a general, unsupported claim of prejudice . . . is insufficient to warrant the severance of counts that are properly joined."). These

conclusory assertions are insufficient to establish "substantial prejudice." Accordingly, the Court should deny the motion to sever pursuant to Rule 14.

## II. The Defendants' Motion to Dismiss Should Be Denied

The defendants move to dismiss Count One of the Indictment on the grounds that it is duplicitous. *See* Fama Mot. 17-20. This argument is both premature and wrong on the merits.

### A. Applicable Law

#### 1. Dismissal Under Rule 12(b)(3)

Rule 12 authorizes non-jurisdictional motions only if "the [C]ourt can determine [them] without a trial on the merits," Fed. R. Crim. P. 12(b)(1), and a defendant lacks any "right to judicial review" of an indictment "[b]eyond a Rule 12 motion," *United States v. Aiyer*, 33 F.4th 97, 116 (2d Cir. 2022) (quoting *Kaley v. United States*, 571 U.S. 320, 333 (2014)); *see also United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) ("If contested facts surrounding the commission of the offense would be of any assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial.").

The dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (cleaned up); *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) (noting that courts should not dismiss an indictment for lack of specificity absent a showing of prejudice). A facially valid "indictment returned by" a proper grand jury is "enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). On a pretrial motion to dismiss, the Court must take as true the allegations in the indictment. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

To withstand a motion to dismiss pursuant to Rule 12(b)(3)(B), the indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)); *accord United States v. Raniere*, 384 F. Supp. 3d 282, 298 (E.D.N.Y. 2019); *United States v. Price*, No. 05-CR-492 (NGG), 2010 WL 1949361, at *5 (E.D.N.Y. May 11, 2010); *United States v. Rea*le, No. 96-CR-1069 (DAB), 1997 WL 580778, at *5 (S.D.N.Y. Sept. 17, 1997).

2. Duplicity

An indictment is duplicitous "if it joins two or more distinct crimes in a single count." *United States v. Sturdivant*, 244 F.3d 71, 75 n.3 (2d Cir. 2001) (cleaned up). The doctrine of duplicity implements Federal Rule of Criminal 8(a)'s "requirement that there be 'a separate count for each offense.'" *Id.* at 75 (quoting Fed R. Crim. P. 8(a)). It is, however, "well established that 'the allegation in a single count of a conspiracy to commit several crimes is not duplicitous.'" *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980) (quoting *Braverman v. United States*, 317 U.S. 49, 54 (1942)). That is because "[t]he conspiracy is the crime and that is one, however diverse its objects." *Id.* at 896 (quoting *Braverman*, 317 U.S. at 54).

At the pre-trial stage, even "[b]oilerplate allegations of a single conspiracy" suffice to defeat a motion to dismiss on duplicity grounds. *United States v. Rajarantnam*, No. 13-CR-211, 2014 WL 1554078, at *4 (S.D.N.Y. Apr. 17, 2014); *see also, e.g., United States v. Gabriel*, 920 F. Supp. 498, 505 (S.D.N.Y. 1996) (same), *aff'd*, 125 F.3d 89 (2d Cir. 1997); *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010) (same). "This is true even where the indictment 'appears to actually allege two distinct conspiracies and thus to offend the prohibition against combining multiple conspiracies within a single conspiracy count.'" *United*

*States v. Molina*, No. 11-CR-528, 2013 WL 2455922, at *1 (S.D.N.Y. June 5, 2013) (quoting *United States v. Gabriel*, 920 F. Supp. 498, 504–05 (S.D.N.Y. 1996)). That is because "[p]retrial dismissal is inappropriate" unless it is clear "on the basis of the pleadings alone that there is no set of facts that could warrant a reasonable jury in finding a single conspiracy." *United States v. Greenberg*, No. 21-CR-92, 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022) (cleaned up). Because that standard is rarely met, "a district court should ordinarily not grant a motion to dismiss for duplicity where the indictment sufficiently alleges a single conspiracy." *Molina*, 2013 WL 2455922, at *1. And even where that stringent standard has been met, a defendant must also "demonstrate prejudice" from the allegedly duplicitous count to be entitled to relief. *Sturdivant*, 244 F.3d at 75 (quoting *Murray*, 618 F.2d at 896).

At bottom, "[i]f the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." *United States v. Barret*, 824 F. Supp. 2d 419, 445 (E.D.N.Y. 2011) (quoting *Ohle*, 678 F. Supp. 2d at 222); *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000) ("Whether the government's proof shows a single conspiracy or multiple conspiracies 'is a question of fact for a properly instructed jury.'" (quoting *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995)); *United States v. Potamitis*, 739 F.2d 784, 787 (2d Cir. 1984) (describing the question of a single or multiple conspiracies as "singularly well-suited to resolution by the jury").

B. <u>Discussion</u>

Count One of the Indictment alleges a single conspiracy: a conspiracy to defraud victims by rigging poker games throughout the country from April 2019 through October 2025. Indictment ¶¶ 47-48. As alleged, the conspiracy spanned years and involved interdependent co-conspirators, including individuals who organized the rigged games, *id.* ¶ 34; provided cheating

technology, *id.* ¶ 35; lured victims, *id.* ¶ 36; protected the games and collected from the victims, *id.* ¶ 38; and laundered the proceeds, *id.* ¶ 39. The Indictment includes non-exhaustive examples of games rigged by the co-conspirators during the conspiracy, which illustrate how these individuals worked together to facilitate the scheme. *Id.* ¶¶ 40-43 (describing several rigged games conducted by the defendants during the course of the conspiracy).

Because the Indictment properly alleges a single conspiracy, the defendant's argument must, as a threshold matter, be rejected as premature. As courts in the Second Circuit have routinely held, it is not possible to "determine pretrial whether the Government successfully will prove a single conspiracy or multiple independent conspiracies." *United States v. Russo*, No. 20-CR-023 (DLI), 2021 WL 1723250, at *4 (E.D.N.Y. Apr. 30, 2021). Rather, "[a]s the Second Circuit has made clear, this is a question of fact for the jury to decide." *Id.* (citing *Johansen*, 56 F.3d at 350); *United States v. Aracri*, 968 F.2d 1512, 1519 (2d Cir. 1992)); *see also United States v. Szur*, 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) ("[S]ince the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single [conspiracy] or multiple conspiracies exist is a question for the jury and is not a basis to dismiss the conspiracy count.").[3] Indeed, the defendants cite no case in which a court granted the relief

---

[3] For example, in *United States v. Gabriel*, 920 F. Supp. 498 (S.D.N.Y. 1996), the court stated in dicta that the conspiracy count at issue "appears to [] allege two distinct conspiracies." *Id.* at 504. Nonetheless, the court held it lacked the power to dismiss the count for duplicity because "the Court of Appeals has repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact singularly well suited to determination by a jury." *Id.* (cleaned up). The court further stated that "[g]iven [the] boilerplate allegations of a single conspiracy, [it] cannot conclude on the basis of the pleadings alone that there is no set of facts falling within the scope of [the conspiracy count] that could warrant a reasonable jury in finding a single conspiracy." *Id.* at 505.

they seek—dismissal of an allegedly duplicitous conspiracy count before trial. *See* Fama Mot. 17-20.

Further, as the government will prove at trial, the defendants' duplicity argument is wrong on the merits. The co-conspirators here worked together to perpetrate a years-long scheme of rigging illegal poker games throughout the country, employing the same means, to achieve the same ends, and, in several instances, victimizing the very same individuals. That they did so in different locations, and with changing membership, is of no consequence. A single conspiracy "is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004) (quoting *United States v. Berger*, 224 F.3d 107, 114-115 (2d Cir. 2000)). And "[c]hanges in members, differences in time periods, and/or shifting emphasis in the location of operations do not necessarily require a finding of more than one conspiracy." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006). Indeed, the charged conspiracy can properly be found by the jury even where there are multiple groups within it, as long as they "share a common goal and depend upon each other and assist each other" and the jury finds that "'each actor was aware of his part in a larger organization where others performed similar roles.'" *Berger*, 224 F.3d at 115 (quoting *United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)).

Lastly, Fama's argument as to prejudice (Fama Mot. 19-20) is irrelevant, as he has failed to show that Count One is impermissibly duplicitous at this juncture, and any risk of juror confusion can be resolved through appropriate jury instructions.

III. Fama's Motion to Suppress Should Be Denied

Finally, Fama moves to suppress evidence seized from his home pursuant to a judicially authorized search warrant signed by the Honorable James R. Cho, United States

Magistrate Judge, Eastern District of New York (the "Search Warrant"). Fama argues that the Search Warrant was legally deficient for two reasons: (i) it lacked a sufficient nexus between the locations to be searched and the alleged criminal offenses, Fama Mot. 21, and (ii) it relied on stale information, *id*. at 24. He further contends that the good faith exception to suppression does not apply because the agent's reliance on the warrant was "not objectively reasonable." *Id*. at 26. These arguments fail.

A. Applicable Law

1. Probable Cause

The Fourth Amendment requires that warrants must be based on probable cause. In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983), and the Fourth Amendment requires "only the probability, and not a prima facie showing, of criminal activity" to meet it, *Gates*, 462 U.S. at 235 (citation omitted). In assessing the sufficiency of a warrant application, the training and experience of law enforcement agents bear significantly on the probable cause determination. *Id*. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience may all support a probable cause finding. *Id.* at 231-32; *see also United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not."). Importantly, a showing of nexus between the alleged criminal activities and the place to be

searched "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).

The Supreme Court has held that courts reviewing a magistrate judge's decision to issue a warrant should apply a "deferential standard," which "further[s] the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984) (per curiam); *see also Gates*, 462 U.S. at 236 (review "should not take the form of *de novo* review"). A court must "resolve any doubt about the existence of probable cause in favor of upholding the warrant," *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998), and must accord "considerable deference to the probable cause determination of the issuing magistrate," *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). Under this deferential standard, an individual "who argues that a warrant was issued on less than probable cause faces a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).

2. The Good Faith Exception

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation" of its terms. *United States v. Leon*, 468 U.S. 897, 906 (1984). The exclusionary rule developed as "a 'prudential' remedy, crafted by the Supreme Court," *United States v. Raymonda*, 780 F.3d 105, 117 (2d Cir. 2015) (quoting *Davis v. United States*, 564 U.S. 229, 236 (2011)), and it is neither a "personal constitutional right" nor a means "to 'redress the injury' occasioned by an unconstitutional search," *Davis* 564 U.S. at 236 (citation omitted). Rather, "[t]he rule's sole purpose . . . is to deter future Fourth Amendment violations." *Id.* Accordingly, "the exclusionary rule is designed to deter police misconduct," not mistakes by judges and magistrates. *Leon*, 468 U.S. at 916.

Thus, even where probable cause is lacking or a warrant is overbroad, suppression will rarely be the appropriate remedy. Indeed, as the Supreme Court has explained, where law enforcement has obtained a warrant, suppression will be "an appropriate remedy" only where (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his judicial role," such that "no reasonably well trained officer should rely on the warrant;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient" that it "fail[s] to particularize the place to be searched or the things to be seized . . . [such] that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

Suppression is also inappropriate unless law enforcement "violated clearly established law." *Daskal*, 676 F. Supp. 3d at 163. "Clearly established law" cannot be defined "at a high level of generality," *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019), and to establish a violation of clearly established law, a defendant must "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (citation omitted). In particular, the court must "look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009).[4]

[4] Although *Emmons*, *Wesby*, and *Okin* addressed qualified immunity, the "standard of reasonableness in the context of suppression mirrors that in the context of qualified immunity." United States v. Nejad, 436 F. Supp. 3d 707, 732 (S.D.N.Y. 2020); *see also Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004).

B. Discussion

1. The Search Warrant was Supported by Probable Cause

Fama's arguments fundamentally fail because they rest on an improper, piecemeal reading of Special Agent Cribbin's supporting affidavit (the "Affidavit"), rather than a commonsense assessment of the Affidavit as a whole. They also reflect a misunderstanding of the probable cause standard, which requires a search warrant affidavit to establish only a "fair probability" that evidence of the criminal offenses would be found on the locations specified. *Walczyk*, 496 F.3d at 156. The Affidavit here plainly meets this standard.

a. Nexus

The Affidavit articulates a clear nexus between the alleged offenses—wire fraud conspiracy and operating an illegal gambling business—and Fama's residence and electronic devices. First, the Affidavit explained that Fama was engaged in rigged poker schemes and illegal gambling: in 2023 and 2024, co-conspirators openly discussed paying Fama substantial proceeds from rigged poker games, *see* Affidavit ¶¶ 31–33, and Fama regularly visited a bar in the immediate vicinity of one of the locations where rigged poker games were regularly held, *see id*. ¶¶ 34. Fama also sent a text message to co-conspirator Minucci, providing an address: "120 Lincoln Avenue." *See id.* ¶ 35. When law enforcement executed a search warrant at this address, they recovered evidence of illegal gambling. *Id*. In other words, the Affidavit provides specific information that Fama profited from illegal gambling and rigged poker games, used an electronic device in furtherance of illegal gambling, and had knowledge of a location where evidence of illegal gambling was subsequently found. That alone provides a "reasonable inference" that evidence would be found in his personal residence and on his cell phone. *Singh*, 390 F.3d at 182 (see also *Walczyk*, 496 F.3d at 156 ("probable cause to search is demonstrated

where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place.") (citations omitted).

Second, the Affidavit also explains why, in Special Agent Cribbin's training and experience, Fama's residence and electronic devices would likely contain evidence of the alleged offenses. The Affidavit specifically explained that, based on Special Agent Cribbin's "training, experience, and knowledge of this investigation," (1) individuals involved in rigged poker games and illegal gambling schemes often use their electronic devices to communicate and store information, *see* Affidavit ¶ 36; (2) members and associates of organized crime, such as Fama, often use cell phones and other electronic device in the commission of crimes such as wire fraud and illegal gambling, *see id.*, ¶ 37; and (3) individuals engaged in financial crimes such as wire fraud and illegal gambling often use their personal residences to store evidence such as currency, ledgers, and receipts, *see id.* ¶ 38. Fama characterizes these statements as "blanket generalizations about how criminals act." Fama Mot. 23. But these statements explain Special Agent Cribbin's personal expertise in investigating these *specific* types of crimes, and why, based on this expertise, he believed that Fama's residence and electronic devices would have evidence. Courts regularly rely on the expertise of law enforcement in determining probable cause. *See United States v. Silva*, 146 F.4th 183, 190 (2d Cir. 2025) ("[a] warrant application may establish the requisite nexus between the alleged crimes and the place to be searched based upon a reasonable inference from the facts presented" such as "an officer's experience [] along with common sense.") (citation omitted) (collecting cases). In this case, Special Agent Cribbin's "personal expertise," in addition to "other particular, corroborating factual allegations linking the alleged crimes to the place to be searched," was more than enough to demonstrate the requisite nexus between the crimes charged and Fama's residence and devices. *Id*. at 192.

b. Staleness

Fama's staleness argument is equally unavailing. "The two critical factors in determining staleness are the age of the facts alleged and the nature of the conduct alleged to have violated the law." *Raymonda*, 780 F.3d at 114 (citation omitted). Here, the Affidavit contains evidence of recent criminal conduct, and also detailed an ongoing and continuous criminal scheme, with conduct occurring as far back as 2022 and as recently as 2025.

With respect to Fama, specifically, the Affidavit cited September 2023 text messages referencing a payment to him, *see* Affidavit ¶ 33, a recorded conversation from August 2024 referencing a payment to him, *see id.* ¶ 31, and the recovery of illegal gambling evidence in December 2024 from 120 Lincoln Avenue, Staten Island, New York—an address he previously texted to a co-conspirator, Nicholas Minucci, *see id*. ¶ 35. The Affidavit also describes Minucci's involvement in the scheme, including his purchase of a rigged shuffling machine in 2022, *see id*. ¶ 40. These facts "present a picture of continuing conduct or an ongoing activity." *Singh*, 390 F.3d at 182 (citations omitted). Given this, "the passage of time between the last described act and the presentation of the application become less significant." *Id*. (collecting cases); *see also United States v. Ortiz*, 143 F.3d 728, 733 (2d Cir. 1998); *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981).

The nature of the information sought by the Search Warrant confirms as much. Electronic data such as texts, emails, or online documents, "is not temporary in nature or likely to dissipate over the intervening time." *United States v. Watson*, No. 23-CR-82 (EK), 2023 WL 7300618, at *7 (E.D.N.Y. Nov. 6, 2023). Financial records are no different: as Special Agent Cribbin described in the Affidavit, such records are typically "maintained in [] residences on a continuing basis." Search Warrant ¶ 38. Given that this type of evidence "does not rapidly disspate[] or degrade," staleness concerns are "rarely relevant" here. *Watson*, 2023 WL

7300618, at *7; *see also United States v. Jakobetz,* 955 F.2d 786, 804 (2d Cir. 1992) (concluding that warrants to search a defendant's residence and vehicles were not based on stale information because they "sought to discover items that [the defendant] could reasonably be expected to retain.").

2. Agents Acted in Good Faith Reliance on the Search Warrant

Even assuming Judge Cho lacked a substantial basis to issue the Search Warrant—and he did not—the motion to suppress evidence from the warrant should be denied because the good faith exception to the exclusionary rule applies. Fama argues this exception does not apply because law enforcement's reliance on the Search Warrant was "not objectively reasonable." *See* Fama Mot. 26. But he makes no argument that law enforcement had knowledge of a constitutional defect. That omission is fatal. Under *Leon*, "evidence obtained from a search should be suppressed only if . . . the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." *Leon*, 468 U.S. at 919 (internal quotation marks omitted).

Nor could the law enforcement officers reasonably have been expected to recognize any such defect. As explained above, the Search Warrant was supported by ample probable cause and satisfied the Fourth Amendment. But even if it were a close call, where "reasonable minds differ" as to whether an affidavit established probable cause, "[o]nce the district court ruled on the legal sufficiency of the facts alleged in the affidavit, the officers were justified in executing the warrant." *United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008). Absent a "deliberate, reckless, or otherwise inexcusable violation[]," the good faith exception to the exclusionary rule applies. *Raymonda*, 780 F.3d at 120.

CONCLUSION

For the foregoing reasons, the motions to sever, dismiss, and suppress should be denied.

Dated: Brooklyn, New York
August 21, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/
Michael W. Gibaldi
Sean M. Sherman
Kamil R. Ammari
Sophia Suarez
Molly N. Delaney
Brandon G. Davis
Assistant U.S. Attorneys
(718) 254-7000